IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                            **Case No. 05-40073-01-RDR**

LONG TIEN DANG,

        Defendant.

## **MEMORANDUM AND ORDER**

This matter is presently before the court upon defendant's motion to suppress and supplemental motion to suppress. The court has conducted a hearing on the motions and is now prepared to rule.

The indictment in this case was originally filed in 2005. The defendant was at that time represented by Michael Holland. Mr. Holland filed a motion to suppress on October 14, 2005. Prior to a hearing on the motion on February 3, 2006, the defendant absconded. The motion remained pending. The defendant was arrested in late 2011. Now, Tom Bartee has been appointed to represent the defendant. He has filed a supplemental motion to suppress evidence.

The defendant is charged in a two-count indictment. In Count 1, he is charged with possession with intent to distribute approximately 22 kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1). In Count 2, the government seeks forfeiture of certain property belonging to the defendant. The charges arise from a

traffic stop of the defendant on July 4, 2005.

In the instant motions, the defendant seeks to suppress all evidence seized. He contends that (1) the initial stop was illegal because he did not commit a traffic violation; (2) the scope and duration of the detention exceeded what is allowed during a public safety stop; and (3) the subsequent search was illegal because it exceeded the scope of his consent.

**Findings of Fact**

On July 4, 2005, Kelly Schneider, a deputy with the Russell County Sheriff's Office, was patrolling Interstate 70 in Russell County, Kansas. Deputy Schneider was a drug interdiction officer. He had been employed in law enforcement since 1986. He had considerable experience in drug interdiction. He had stopped hundreds of cars during his law enforcement career and had found drugs in a significant number of them. He had received substantial training in this area.

At approximately 8:24 a.m., Deputy Schneider observed a 2002 green Honda Accord traveling eastbound on I-70 at approximately mile marker 196. At that point, I-70 is four-lane highway with two eastbound and two westbound lanes. It is straight with only some modest hills. He followed the car and observed that it twice traveled across the fog line on the right side of the road. During one of the times that the car crossed the fog line, the car traveled for about 30 feet on or over the fog line. These

2

movements occurred within a short distance. Deputy Schneider believed that the driver of the car might be sleepy or impaired. The weather was sunny with a light breeze. The wind that was blowing was from the south. Deputy Schneider observed nothing that would have forced the car out of its lane and onto and over the fog line. Deputy Schneider pulled his car up to the side of the Honda to determine how many individuals were the car. He saw only the driver. He then dropped behind the car and turned on his emergency lights. The Honda immediately pulled to the side of the road. The stop occurred near milepost 197.

Deputy Schneider's marked patrol unit has a video camera installed in the front windshield. The camera is activated when the emergency lights are turned on. The camera can be manually activated by the driver. Here, Deputy Schneider did not activate the camera prior to the stop. The camera came on when the emergency lights were activated. The remainder of the stop was recorded by the video camera. Deputy Schneider had a wireless microphone that he wears on his person. He activated it when he got out of his car. The microphone picked up most of the conversation that took place between Deputy Schneider and the driver of the car. Some of the conversation, particularly some of the statements made by the driver, is not audible. Deputy Schneider testified that the quality of the transmission depended upon strength of the batteries in the remote unit and the distance

3

from the patrol car.  Environmental factors such as the wind also affected the quality of the recording.

Deputy Schneider approached the car on the passenger's side. He was dressed in a police uniform.  The driver, who was subsequently identified as Long Tien Dang, rolled down the passenger's window and spoke to him through the window.  Deputy Schneider said: "Hi there.  How are you doing today?  You were driving over here on the white line.  I wanted to make sure you were doing okay."  Dang indicates that he is fine.  Deputy Schneider then states: "You were outside the white line.  I didn't know if you were going to sleep.  You doing okay?"  Dang again answers that he is doing fine.  Deputy Schneider asks for Dang's driver's license and registration.  Dang promptly supplies them. Deputy Schneider noted that Dang's hands were shaking as he handed him the license and registration.  He noted that most people who are stopped are nervous, but he found Dang's nervousness excessive. Deputy Schneider noticed that Dang was dressed nicely.  Dang was wearing a dress shirt and a tie.  Deputy Schneider thought his dress was suspicious for July 4th.  He thought it was unusual for someone to be dressed as if he were working on a national holiday.

Deputy Schneider was able to easily converse with Dang.  Dang spoke English well and never asked for an interpreter.  During the entire encounter, Deputy Schneider spoke generally in a conversational tone of voice.

Deputy Schneider then asked Dang about his travel plans, whether he owns the car, and his occupation. Dang responded that he is traveling from Denver to Indianapolis. He further indicated that he owns the car and that he works for a consulting firm. Deputy Schneider took the driver's license and registration and returned to his car.

Deputy Schneider seeks information from his dispatcher on the license and registration. He determined that the license and registration were valid. He wrote a warning ticket to Dang for failure to maintain a single lane of travel.

Deputy Schneider returned to Dang's car. Again, he contacted Dang at the passenger window. He returns Dang's documents to him. He tells Dang that he is giving him a warning ticket and that he did not have to pay any fine. Dang engaged Deputy Schneider in some conversation at this point by asking some questions. The microphone is unable to pick up the comments of Dang. Deputy Schneider eventually says: "We get a lot of drunk and tired people on this weekend, so we are checking a lot of people." He then says: "Be careful. Have a safe trip." Deputy Schneider took a couple of steps back before he returned to near the passenger window. He asked Dang if he could ask him a couple more questions. Dang responded in the affirmative. Deputy Schneider tells him that he sees a lot of guns and drugs on I-70. He asked if Dang has any guns and drugs with him. Dang says no. Deputy Schneider then

5

said, "Mind if I take a quick look in the car?" Dang indicated that he has no objection. Deputy Schneider then said, "Is there any way I can get you to step to the front for my safety?" Dang begins to exit the car. Deputy Schneider asks him to open the trunk. Dang does so.

At about 8:32 a.m., Deputy Schneider began to examine the items in the trunk. He found only some clothing items. He sees nothing of importance. Deputy Schneider then said to Dang: "Have you been stopped on this trip before?" Dang said, "one time" and began to explain the stop. Deputy Schneider again asked Dang to step back to the front of the car. While at the passenger door, Deputy Schneider said: "I'll take a quick look in here." He opened the door and then began to examine the area behind the passenger door. On the outside of the car, Deputy Schneider taps on the area of the rear quarter panel. Deputy Schneider, who has experience in auto mechanics, is aware that this area in vehicles is hollow. When he taps on the area, he expects to hear a hollow sound. Rather, he hears a "thud," indicating that something might be secreted in that area. At 8:36 a.m., Deputy Schneider returned to his car and retrieved a portable density meter. As the name suggests, a density meter measures the density of objects. The reading on the density meter indicates to Deputy Schneider that something is behind the rear quarter panel. He takes readings on the trunk and they correspond to a hollow space. At this point, he

turned to Dang and said: "You got something in this door? I need you to step back up there. There is an extremely high reading." He then takes readings on the rear quarter panel on the driver's side and they also show that something is behind that area. Deputy Schneider had been trained in the use of the density meter. He had used it about ten times prior to this stop.

Dang came closer to Deputy Schneider as Deputy Schneider continued to examine the area around the rear quarter panel. Deputy Schneider said: "There is something in there." Dang then approached again and suggests that a search warrant may be needed. Deputy Schneider stated: "No, you consented to the search. You don't want me to search no more?" Dang indicated that Deputy Schneider can continue. Deputy Schneider returned to his car to get a pry bar. He used the pry bar to push back some plastic on the inside of the car. He can see some black packages in the area behind the rear quarter panel. The packages appeared to be about the size of a kilogram and were are wrapped in black electrical tape. The packaging indicated to Deputy Schneider that they are illegal drugs.

After discovering the black wrapped packages, Deputy Schneider handcuffs Dang and has him sit on the pavement in front of the car. Deputy Schneider called for assistance. Dang and his car were then transported to the Russell County Sheriff's Office. The car was thoroughly searched. Thirteen packages were found on the passenger

7

side of the car, and nine packages were found on the driver's side. The packages were later discovered to contain cocaine.

**Conclusions of Law**

The Fourth Amendment of the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., Amend. IV. "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement, through means intentionally applied." Brendlin v. California, 551 U.S. 249, 254 (2007) (citations and internal quotation marks omitted).

*Initial Stop*

Traffic stops are seizures within the meaning of the Fourth Amendment analogous to investigative detentions. See United States v. Bradford, 423 F.3d 1149, 1156 (10th Cir. 2005). A traffic stop is lawful if the detaining officer has a reasonable suspicion that (1) criminal activity may be afoot, see United States v. Arvizu, 534 U.S. 266, 273 (2002), or (2) a traffic violation has occurred or is occurring, see United States v. Soto, 988 F.2d 1548, 1554 (10th Cir. 1993).

To lawfully initiate a traffic stop, "the detaining officer must have an objectively reasonable articulable suspicion that a

8

traffic violation has occurred or is occurring." Soto, 988 F.2d at 1554. Thus, the constitutionality of an initial stop depends upon whether the detaining officer "had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (en banc) (internal quotation marks omitted).

The government has suggested that Deputy Schneider had reasonable suspicion to stop Dang's car for violating K.S.A. 8-1522(a). The defendant has raised four arguments why Deputy Schneider lacked reasonable suspicion to stop his car: (1) he denies that he drifted onto or across a lane marker; (2) he contends that he did not violate the statute because any isolated weaving was due to the windy conditions; (3) Deputy Schneider had no reason to believe that he was sleepy, impaired or otherwise presented a threat to public safety; and (4) his movement outside a single lane was safe and, therefore, not prohibited by K.S.A. 8-1522(a).

For many years, the courts have addressed purported violations of K.S.A. 8-1522(a). The statute provides:

> [w]henever any roadway has been divided into two (2) or more clearly marked lanes for traffic, .... [a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.

In the original motion to suppress, the defendant relied upon

United States v. Gregory, 79 F.3d 973 (10th Cir. 1996) for support. In the supplemental motion, the defendant relied upon State v. Marx, 289 Kan. 657, 215 P.3d 601 (2009) for support.

Marx provides the latest, and perhaps most important, guidance concerning K.S.A. 8-1522(a). In Marx, the Kansas Supreme Court clarified the relationship between the two major clauses of the statute as follows:

> To summarize, we interpret K.S.A. 8–1522(a) as establishing two separate rules of the road. The first requires a driver to keep entirely within a single lane while traveling on a roadway with two or more clearly marked lanes. That rule is temporarily suspended when it becomes impracticable to stay within the lane markers and when the driver is properly effecting a lane change. Proof that driving outside the lane markers created no safety hazard is not a defense to the single lane rule. The second rule provides that before a driver may change lanes or move from the current lane of travel to another location, he or she must ascertain that the movement can be made with safety. A traffic infraction occurs under K.S.A. 8–1522(a) when either rule of the road is violated.

215 P.3d at 612.

The Court went on to find that the statute requires "more than an incidental and minimal lane breach." Id. The Court held that to establish reasonable suspicion "a detaining officer must articulate something more than an observation of one instance of a momentary lane breach." Id. The Court then considered whether a driver who had crossed the fog line, overcorrected, and then crossed the centerline constitutes a violation of the statute. The Court ultimately determined that the state had failed to carry its

burden that the deputy had reasonable suspicion that the driver had violated the statute because (1) the deputy had only observed one instance where the vehicle did not maintain a single lane of travel; (2) no testimony had been offered on how far the vehicle crossed either the fog line or the centerline; (3) the deputy had not offered any information on traffic conditions; and (4) no testimony was offered which the court could even infer that it was practicable to maintain a single lane of travel. Id. at 613.

This court recently observed:

> Marx is not noticeably different from the interpretations of K.S.A. 8-1522(a) reached by the Tenth Circuit in the past. The Tenth Circuit has determined that an officer's observation of a vehicle straying out of its lane multiple times over a short distance violated K.S.A. 8-1522(a) so long as the strays could not be explained by "adverse physical conditions" such as the state of the road, the weather, or the conduct of law enforcement. United States v. Ozbirn, 189 F.3d 1194, 1198 (10th Cir. 1999); see also United States v. Cline, 349 F.3d 1276, 1287 (10th Cir. 2003); United States v. Zabalza, 346 F.3d 1255, 1258-59 (10th Cir. 2003).

United States v. Perez-Guerrero, 2012 WL 683201 at * 8(D.Kan. 3/2/2012).

The court notes initially that Marx forecloses the defendant's argument that K.S.A. 8-1522(a) requires reasonable suspicion that both clauses of the statute must be violated--maintain a single lane of travel and ascertain that movement can be made safely--before a stop can be made. The defendant has conceded this argument in his supplemental memorandum.

The court next finds that the facts in this case are

11

distinguishable from Marx and Gregory. In Marx and Gregory, the courts determined that K.S.A. 8-1522(a) was not violated where the drivers only strayed from their lane on one occasion. Those courts also considered other factors in determining that the respective officers in those cases did not have reasonable suspicion that the drivers had violated the statute. The court in this case found the testimony of Deputy Schneider sufficient to demonstrate reasonable suspicion that Mr. Dang had violated K.S.A. 8-1522(a). Deputy Schneider, an experienced law enforcement officer, testified that he observed Dang's Honda travel across the fog line two times in a short distance. He noted that when Dang crossed the fog line on the second occasion, he drove on it or over it for about 30 feet. Deputy Schneider further testified that he did not believe that the light wind conditions could have caused the drifting. He further indicated that he observed no circumstances that would have prevented Dang from maintaining a single lane of travel.

At the hearing, Dang testified he was an experienced driver and he had never received a traffic ticket since he began driving in 1976. He indicated it was unlikely that he would have traveled out of his lane prior to the stop by Deputy Schneider. He further stated he had gotten a good night's sleep on the previous night. He testified that he had no distractions prior to the stop and that he was not using his cell phone.

The court found Deputy Schneider's testimony more credible on

12

the issue of whether Dang strayed twice from his lane of travel. Deputy Schneider was focused on the car he was following and is familiar with the requirements of K.S.A. 8-1522. The court found his testimony consistent with the comments he made on the videotape following the stop. The court recognizes that no video of the suggested violation exists, but Deputy Schneider's testimony on what he observed was credible. In sum, the court believes the government demonstrated that Deputy Schneider had reasonable suspicion to stop Dang for a violation of K.S.A. 8-1522.

With this decision, the court need not consider whether Deputy Schneider properly stopped the defendant for public safety reasons, i.e., that he was fatigued or impaired. The court has determined that the defendant was properly stopped for reasonable suspicion of a violation of K.S.A. 8-1522(a), so we need not evaluate the circumstances of the stop for public safety reasons.

*Scope and Duration of Detention*

The defendant next contends that the scope and duration of his detention exceeded the limits of the Constitution in this case. An investigatory stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." Terry v. Ohio, 392 U.S. 1, 20 (1968). In order to satisfy this requirement, the ensuing detention "must not exceed the reasonable duration required to complete the purpose of the stop." United States v. Rice, 483 F.3d 1079, 1082 (10th Cir. 2007). Accordingly,

13

in the context of an investigatory stop of a motorist, "[o]nce an officer returns the driver's license and registration, the traffic stop has ended and questioning must cease; at that point, the driver must be free to leave." United States v. Villa, 589 F.3d 1334, 1339 (10th Cir. 2009). The detention cannot be continued beyond this point "unless the driver consents to further questioning or the officer has reasonable suspicion to believe other criminal activity is afoot." Rice, 483 F.3d at 1083–84. Even a very brief extension of the detention without consent or reasonable suspicion violates the Fourth Amendment. See United States v. Lopez, 443 F.3d 1280, 1285 (10th Cir. 2006) ("The Supreme Court has also made clear . . . that an individual 'may not be detained even momentarily without reasonable, objective grounds for doing so.'" (quoting Florida v. Royer, 460 U.S. 491, 498 (1983))).

The defendant has suggested that he should not have been stopped for a violation of K.S.A. 8-1522(a). He also suggests that the scope and duration of the stop was longer than necessary if he was stopped only because the officer believed that he was tired or drunk. He contends that he should have been allowed to leave once it was determined he was not fatigued or intoxicated.

As noted above, the court found that the defendant was lawfully stopped for a violation of K.S.A. 8-1522(a). The court found nothing to support the defendant's argument that the investigative detention lasted longer than necessary to effectuate

14

the purpose of the stop. Even after Deputy Schneider determined that the defendant was not fatigued or impaired, he could obtain the defendant's documents and run the necessary checks. United States v. Burleson, 657 F.3d 1040, 1045 (10th Cir. 2011) ("it is well-settled in the traffic-stop context that while an investigative detention is ongoing, a police officer may obtain an individual's name and check that name for outstanding warrants."); United States v. Villa, 589 F.3d 1334, 1339 (10th Cir. 2009) ("It is well-established that: A law enforcement officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation."). There was no violation here because the detention lasted only for the amount of time necessary to perform the routine checks on the defendant. Once Deputy Schneider handed the documents back to Dang and wished him a safe trip, the encounter became consensual. See United States v. Ledesma, 447 F.3d 1307, 1315 (10th Cir. 2006); United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997); United States v. Elliott, 107 F.3d 810, 814 (10th Cir. 1997).

*Scope of Defendant's Consent*

The defendant next contends that Deputy Schneider's search of his car exceeded the scope of his consent. The defendant focuses on the officer's initial request to take a "quick look" and his subsequent withdrawal of consent. The defendant argues that the search lasted too long--10 minutes--and that Deputy Schneider

15

continued to search after he withdrew his consent.  The defendant has also argued that the consent to "take a quick look in the car" did not authorize the use of the density meter by Deputy Schneider.  The defendant relies upon <u>United States v. Lyons</u>, 510 F.3d 1225 (10th Cir. 2007) for support of this argument.  He suggests that <u>Lyons</u> represents the outer limits of the use of sense-enhancing devices under the rubric of consent.

The government suggests that the search was very brief--only six minutes--before Deputy Schneider obtained the density meter reading which provided him with probable cause to believe the defendant was transporting contraband.  The government contends that the defendant's efforts to withdraw the consent came too late, i.e., Deputy Schneider had already found probable cause to search before the consent was withdrawn.  The government further argues that he never withdrew his consent to search the car.

In <u>United States v. Rosborough</u>, 366 F.3d 1145, 1150 (10th Cir. 2004), the Tenth Circuit outlined the law concerning the scope and duration of searches:

> Whether a search exceeds the scope and duration of consent is a question of fact, reviewable for clear error, which turns on what a reasonable person would have understood to be the scope and duration of his consent under the circumstances. <u>Florida v. Jimeno</u>, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). A general grant of permission to search an automobile typically extends to the entire car, absent an objection or an explicit limitation by the grantee. <u>United States v. Deases</u>, 918 F.2d 118, 122 (10th Cir. 1990). Where a defendant's consent is predicated explicitly on an understanding that the search will be brief, an extended

16

detention sometimes exceeds the scope of the consent. United States v. Wald, 216 F.3d 1222, 1228 (10th Cir. 2000).

A defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication that the search was within the scope of consent. United States v. Jackson, 381 F.3d 984, 988 (10th Cir. 2004). Where the expressed purpose of the search is to look for drugs or contraband, "[t]hat certainly implies that the officer could look wherever drugs might be hidden." United States v. Ramstad, 308 F.3d 1139, 1146-47 (10th Cir. 2002) (citation omitted).

A review of the videotape reveals that Dang voluntarily consented to a search of his car. The subsequent search was indeed brief. The entire search lasted only about ten minutes before the contraband was discovered. The search had only lasted six minutes when Deputy Schneider obtained and used the density meter. The court believes that the circumstances show that the search did not exceed the scope of the consent.

In addition, the court does not find that the defendant ever withdrew his consent. At one point, it does appear that he is contemplating doing so. He suggests to Deputy Schneider that a "search warrant" may be necessary. However, when he is asked directly by Deputy Schneider if he wants him to discontinue the search, the defendant indicates that he does not.

Finally, the court does not find that Deputy Schneider's use of the density meter was unauthorized by the defendant's consent to "take a quick look in the car." The court fails to find that Lyons supports the defendant's contention.

In Lyons, an officer who had been given consent to look in the back of a vehicle used an "echo test" on a spare tire. The test consisted of striking the tire while listening to the thud through a stethoscope. Hearing a low thud, he removed the tire, cut it open and found 51 pounds of cocaine. The Tenth Circuit noted that "[w]hether an 'echo test' is a search presents a close and interesting question." 510 F.3d at 1240 n. 9. The Tenth Circuit avoided the question and found that the consent allowed the echo test, likening it to the use of a flashlight or a mirror to enhance the senses.

The defendant has suggested that the use of the density meter is different than the stethoscope used in Lyons. The defendant suggests that the use of this device goes beyond that in Lyons and renders the search beyond the scope of his consent. The defendant further argues that the "high reading" on the density meter did not provide probable cause to justify a continued warrantless search beyond the limited scope of the initial search. The defendant contends that this high reading, coupled with the other facts, does not show probable cause justifying a warrantless search.

The court is not persuaded that the use of the density meter

exceeded the scope of the defendant's consent or constituted a Fourth Amendment violation. The use of a density meter does not constitute an unreasonable search. It is not destructive or intrusive. See United States v. Chaudhry, 424 F.3d 1051, 1053 n. 3 (9th Cir. 2005) ("We have also concluded that a suspicionless search of a spare tire using a radioactive density meter called a "Buster" was not unreasonable because it was not destructive or intrusive, and because there was no potential harm to the motorist."). The court believes that it is more akin to the use of a drug dog. See United States v. Place, 462 U.S. 696, 706-07 (1983) (holding that dog sniff is not a search because it is unique in that it does not intrude on or disclose any information other than whether contraband is present).

To the extent that the defendant's question about the need for a search warrant suggests a withdrawal of consent, the court finds that, at that point, Deputy Schneider had probable cause to believe that the defendant was transporting contraband based upon the readings of the density meter. See United States v. Vicuna, 2010 WL 1337515 at *9 (W.D.La. 2010) ("Once the density meter confirmed the presence of a hidden compartment in the extended cab, this discovery provided probable cause to conduct a warrantless search of the truck, both onsite and at the troop headquarters.").

In sum, the court finds no merit to the arguments raised by the defendant, both in his original motion to suppress and in his

supplemental motion.  The court commends the ingenuity of both defense counsel in the motions, but ultimately must conclude that the Fourth Amendment was not violated here.

**IT IS THEREFORE ORDERED** that defendant's motion to suppress (Doc. #14) and supplemental motion to suppress (Doc. # 50) be hereby denied.

**IT IS SO ORDERED.**

Dated this 24th day of April, 2012 at Topeka, Kansas.

                                s/Richard D. Rogers
                                United States District Judge